# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| ADRIANA SUCIU, | No. 55887-4-II |
| Appellant, | |
| v. | UNPUBLISHED OPINION |
| WASHINGTON STATE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | |
| Respondent. | |

WORSWICK — Adriana Suciu appeals the superior court's order affirming a final order of the Board of Appeals (Board) of the Department of Social and Health Services (Department), in which the Board determined Suciu neglected a vulnerable adult. Suciu was the primary caregiver for Doris, a 96 year-old bedfast vulnerable adult. A nurse observed repeated bruising on Doris and contacted the Department's Adult Protective Services (APS). APS substantiated a neglect finding against Suciu, and Suciu appealed to the Office of Administrative Hearings. After a five-day hearing, an Administrative Law Judge (ALJ) issued an initial order affirming the Department's findings. The Board affirmed the initial order and filed a published order. Suciu filed for judicial review and the superior court affirmed the Board's decision.

On appeal, Suciu assigns error to multiple findings of fact and argues that substantial evidence does not support the Department's findings, that the Department's

conclusions of law were not supported by those findings, and that the superior court erred when it affirmed the Board's final order. We disagree and affirm.

FACTS

I. BACKGROUND

Suciu was a paid caregiver at the Heaven Home Health Adult Family Home.[1] Doris was a bedfast, nonverbal, 96 year-old, vulnerable adult who entered hospice care at the home beginning in July 2017.

On admission to Suciu's home, Doris's guardian—her son, Tim—entered into a June 30 negotiated care plan with Suciu for Doris's care. The June 30 plan noted that Doris was unsteady on her feet and was a fall risk but was somewhat verbal and mobile, able to undress and feed herself to an extent. It noted that Doris bruised easily. The negotiated care plan stated that Doris had dementia and was taking Haloperidol, also called Haldol, which had a side effect of causing a person to bruise easily.

Doris also had Physician Orders for Life Sustaining Treatment (POLST) dated May 2017, which stated that she was not to receive CPR if she had no pulse and was not breathing, and that for medical interventions she was to receive "comfort measures only." Admin. Record (AR) at 282. These included "medication by any route, positioning, wound care, and other measures to relieve pain and suffering," and using "oxygen, oral suction, and manual treatment of airway obstruction as needed for comfort." AR at 282.

---

[1] Suciu's husband John Suciu, also referred to in the record as Ioan, is the home's co-owner and manager. He was not cited by the Department.

Suciu filed an incident report on July 5 that said Doris fell and had a bruise on her left knee. On July 6, Suciu filed an incident report that Doris fell while getting out of bed, resulting in a cut to Doris's head and multiple bruises to her wrist and body. The incident report contained notes dated July 8-11, noting "many falls" and other injuries to Doris, but it is unclear from the record on appeal when Suciu added these notes to the report. AR at 607.

Suciu filed another incident report on July 12, which noted bruising to Doris's left shoulder and lower left leg. Suciu noted that Doris fell, was very agitated, not sitting still, and was aggressive with staff. Suciu filed another report on July 13 that stated Doris fell again, and noted bruises to Doris's head. In a July 16 incident report, Suciu again noted she "found [Doris] w[ith] a bruise on her r[ight] corner eye." AR at 610. On July 25, Suciu reported Doris was again agitated and had bruises on her lips, leg, and hand. Once again, Suciu added notes to the report from subsequent days, but it is unclear when Suciu added to the report.

For the duration of Doris's stay at the home, she was also visited multiple times a week by registered nurses who would examine her and file short reports. One nurse who routinely saw Doris was Heidi Bishop. On July 14 Bishop noted Doris had "random bruising to extremities and face." AR at 612. Suciu also kept a log of Doris's medications and how much she administered and took progress notes on her patients.

On August 4 and August 8, Nurse Bishop recorded that Doris's bruising to her face "remain[ed]" and that Doris had a cut on her left hand. AR at 624. On August 11, Bishop reported the bruising to Doris's face was "resolving." AR at 625. On August 22, Bishop reported Doris was "well palliated," but again noted bruising to Doris's upper lip, forearms, and hands. AR at 342, 625.

3

On September 1, Suciu filed an incident report that Doris became agitated, got up from her bed, and fell on the carpeted floor. Suciu noted bumps and bruises to Doris's head and tailbone. Once again, Suciu added notes to this report, dated on the following days that stated Doris appeared to be healing, but it is unclear from the record when Suciu added these notes. Nurse Bishop's notes from the same day do not mention any bruising. Bishop's notes from September 5 state that Doris reported pain from her backside. On September 12, Bishop noted that she planned to decrease visits to once weekly.

On October 28, Suciu filed an incident report that Doris was agitated and hit her head on the wall. Suciu reported that she did not know "exactly what happen[ed]" but that Doris had bumps and bruises to her head. AR at 641. Again, the report was annotated in the following days, with a note dated November 1 that stated Suciu noticed an additional bruise in the middle of Doris's head. On November 1, Nurse Bishop noted edema to Doris's face and that she was going to increase her visits to twice weekly. On November 9, Bishop reported the bruising to Doris's face was resolving.

Around this time, in November 2017, Doris's condition deteriorated, resulting in her hospitalization and an updated negotiated care plan. Doris returned to Suciu's care after leaving the hospital, but was bedfast and nonverbal. The updated negotiated care plan from November 1 states that Doris was unable to talk anymore and had become totally dependent on others for physical mobility. The updated plan stated that Doris was not able to reposition herself in bed. It further stated that Doris was no longer able to feed or dress herself. The plan again stated that Doris's face bruised easily because of the Haldol medication.

4

On December 20, Suciu filed another incident report that Doris had bruising to her head. Suciu noted that she accidentally hit Doris in the head with her elbow while trying to reposition Doris. On December 21, Nurse Bishop recorded that Doris had swelling to her right cheek with lesions at the corner of her mouth. Bishop noted the lesions were resolving on December 26.

On January 2, 2018, Bishop recorded Doris had "generalized bruising" but noted on January 9 that the bruising to Doris's forehead and the right side of her neck was resolving. AR at 673-74. On February 20, Suciu filed an incident report in which she stated Doris had a cut on her left hand. On February 27, Nurse Bishop again noted that Doris appeared well palliated and noted she would decrease her visits to once weekly.

On May 1, Suciu filed an incident report that Doris had bruising to her left eye and lips. Suciu appeared to report that the bruising was caused by Doris pressing her fingers against her face while sleeping on her left side and that Suciu reported the bruising to Nurse Bishop. In Nurse Bishop's notes from May 2, she noted Doris had a large bruise to her left forearm and upper lip but that Doris appeared well palliated. On May 9, Bishop reported Doris had "generalized upper body bruising." AR at 704.

On June 2, Suciu filed another incident report in which she reported Doris had bruising to her face and neck. Suciu noted Doris became agitated, kept her mouth closed, and could not breathe. Suciu stated Doris needed help and that she opened the side of Doris's mouth for Doris to breathe through, after which Suciu gave Doris an extra dose of Haldol to calm her. Suciu's report appears to state that Doris's bruises appeared after this event. Nurse Bishop's notes in the following days do not suggest any major trauma, state that Doris had edema to her face, and that she appeared well palliated.

On June 14, a report was made to APS that Doris had purple bruising on her left check to temple that looked fresh and a fading bruise around her right eye. The report stated that when the reporter went to take Doris's blood pressure, Doris flinched, and that this raised the reporter's suspicions of possible physical abuse.

That same day, APS removed Doris to Legacy Salmon Creek Hospital for examination. Medical records from the hospital showed that Doris had bruises to her left temple, cheek, ear, chin, shoulder, hip, and leg. Hospital records show that medical staff there requested an APS report as well, apparently unaware that Doris was transferred to the hospital because of the APS report. Hospital staff created a case with police for them to come take pictures of Doris's injuries.

## II. APS INVESTIGATION

The Department assigned Regina Quirk, an APS investigator, to investigate the report regarding Doris. Quirk spoke to the person who made the APS report, who told Quirk that Doris's arms and legs were contracted to the point where she could not have injured herself and that her injuries were inconsistent with her health conditions. Quirk went to Suciu's home when Doris was removed to the hospital and saw bruising along Doris's forehead that extended down her cheek, and some on the right side of Doris's nose. She also noticed that Doris's ear and neck appeared swollen with yellow bruises. Quirk noticed that Doris was in nearly a fetal position with her arms and legs contracted.

After Doris's examination at the hospital, she was discharged to a hospice center. A nurse at the hospice center reported to Quirk that by June 20, Doris's bruising had started to fade

and heal, and she displayed no new bruising. The nurse also reported that Doris had not been agitated and required no Haldol while at hospice. Doris died at the hospice center on June 25.

Quirk interviewed Nurse Bishop, who told Quirk that she was concerned about the way Suciu handled patients—that Suciu's demeanor was rough and impatient. In a June 26 declaration to APS, Bishop stated that on May 2, she had noted bruising to Doris's chin, forearms, and upper lip. According to Bishop, when Bishop asked Suciu how it had happened, Suciu told Bishop it happened because she had to pry Doris's mouth open to brush Doris's teeth. Bishop stated that she instructed Suciu to cease brushing Doris's teeth and not force care. Bishop then stated she subsequently saw significant bruising on Doris on June 6 and 13 "consistent with . . . forced oral care." AR at 191.

On June 20, Quirk conducted an unannounced interview at the Suciu home. Quirk asked Suciu if Suciu required an interpreter, but Suciu declined.[2] Suciu reported to Quirk that after November 2017, Doris was no longer able to raise her hands to feed or dress herself and was completely dependent on the caregivers. However, Suciu told Quirk that Doris was able to raise her left finger and often slept with her finger in her mouth, which caused the bruising to Doris's face. Suciu made comments to Quirk that she did not want Doris to die and would put her fingers in Doris's mouth to help her breathe.

APS also sent Jenifer Jones, a registered nurse, to inspect and investigate the Suciu home. Suciu reported to Jones that she would put her fingers in Doris's mouth to try to pry her teeth apart to get Doris to breathe.

---

[2] Suciu's first language is Romanian.

In September 2018, APS concluded its investigation and found that it was more likely than not that:

> On [or] around and between November 1, 2017 and June 14, 2018, while a caregiver to a vulnerable adult, you did not follow protocol when the vulnerable adult could not breathe and you caused unnecessary bruising to the vulnerable adult when brushing the vulnerable adults [sic] teeth and moving the vulnerable adult in her bed. You did not prevent physical or mental harm to the vulnerable adult while acting as the vulnerable adult's caregiver.

AR at 120.

## III. PROCEDURAL HISTORY

Suciu appealed the APS finding to the Office of Administrative Hearings. The ALJ conducted five days of hearings. The parties did not dispute that Doris was a vulnerable adult. Suciu, Nurse Bishop, Quirk, and Advanced Registered Nurse Practitioner (ARNP) Charlotte White all testified.

### A. *Hearing, Testimony, and ALJ's Initial Order*

Suciu testified with the aid of an interpreter. Suciu's report stated:

> [Doris] became very agitated and making big sounds around 11, noon. Not sleeping and caregiver, [Suciu], I notice that she is in pain due to her left side – it was right side – face infection. Caregiver, [Suciu], giving her (Inaudible) two tablets, 650 milligram, and . . . was relieved. [Doris] became calm, restful (Inaudible). [Doris] raised her left hand up with pointing finger to stop when agitated, unable to talk, or said anything. Caregiver tried to comfort her by talking with her and wash her face gentle.

2 Verbatim Report of Proceedings (VRP) at 25-26.

Suciu testified that she did not pry open Doris's mouth to help her breathe, but that she administered medication. Suciu testified that on June 2, 2018, Doris had clenched down on a sponge when Suciu was trying to brush her teeth with it. Suciu testified she waited for Doris to release the sponge. She testified that the June 2 incident report blended the events of two

8

incidents: one where Doris became agitated during tooth brushing, and another where she became agitated when her son was visiting in May, her face turned blue, and Suciu used a syringe in Doris's mouth to administer medication.

Quirk testified that Suciu told the APS reporter that Doris's bruises were caused by Suciu prying Doris's mouth open after she clenched down on a toothbrush. Quirk testified Doris was unable to move her arms when Quirk observed her on her removal to the hospital. Quirk next testified that Suciu told Quirk that when Doris had a hard time breathing, Suciu would shake Doris and pry her mouth open, and then Doris would gasp for air. Quirk testified that when she asked Suciu if she was trained to pry open Doris's mouth, Suciu responded, "no," but then asked what she was supposed to do. 3 VRP at 70. Quirk then testified that Suciu stated she knew about the Do Not Resuscitate (DNR) order in the POLST, but stated, "Did you want me to let her die? I was providing hospice." 3 VRP at 70. Quirk further testified that she asked if Suciu had been delegated authority to open Doris's mouth in such circumstances, and Suciu said no.

Quirk also read some of Jones's report into the record. 3 VRP at 100-101. According to Jones's report, Suciu relayed a similar story to Jones, telling Jones she would

> put her fingers in [Doris's] mouth and try to pry her teeth apart to get her to breathe. [Suciu] demonstrated the procedure using her own finger, own mouth, and index finger. [Suciu] opened her lips, clenched her teeth and placed an index finger on each side of her mouth, and stretch her lips by pulling the corners of her lips out. [Suciu] stated she knew CPR. She stated [Doris] was do not resuscitate, but I did not want her to go.

3 VRP at 101.

Nurse Bishop was asked about whether, in the context of Doris's POLST, what would constitute "comfort measures," or "manual treatment of airway obstruction as needed for comfort." 1 VRP at 83. Bishop testified that "manual treatment would be if someone was

choking on food, is how I would interpret that. And you could do a . . . finger sweep to remove, um, food." 1 VRP at 84. Bishop testified that she would not recommend shaking someone who quit breathing because it would not be a comfort measure. Likewise, she testified that people on hospice are "expected to die a natural death. And if they are not breathing, there is no reason why you would open their mouth." 1 VRP at 85. Bishop further testified that after November 2017, Doris was "virtually immobile" and that her arms were so contracted that Bishop could not straighten them to take her blood pressure. 1 VRP at 65-66.

Bishop testified that when she asked Suciu about the bruising, Suciu stated it was caused by holding Doris's mouth open while Suciu brushed her teeth. "[Suciu] stated that it was because they have to hold her chin and upper lip to pry her mouth open to brush her teeth." 1 VRP at 69. Bishop also testified that she tried to educate Suciu on not forcing Doris's mouth open, to forgo using a toothbrush, and that using a sponge to gently wipe a patient's teeth was more appropriate.

Nurse Bishop testified, however, that the word "pry" was "probably" Bishop's word, not Suciu's because Bishop did not note it as a quote in her notes. 1 VRP at 106. Suciu testified that "[Nurse Jones] must have understood that I opened [Doris's] mouth, but I didn't open her mouth." 2 VRP at 69. Suciu further testified that "[Jones] understood that I put my fingers in her mouth to pry it open, but I did not, uh, do that." 2 VRP at 70.

Nurse Angela Stewart, from the hospice center, also testified. Stewart testified that she had cared for Doris before Doris entered Suciu's care, and that she was surprised at the level of deterioration as well as Doris's bruising on her readmission to the hospice center. She testified that Doris had bruising to her face and hip that were in various stages of recovery, which

10

suggested to Stewart that the bruises had occurred at different times.  Stewart further testified that Doris was unable to move her arms when she was admitted to the hospice center in June.  She testified that Doris did not suffer any further bruising while at the hospice center.  Stewart then testified that forcing the mouth open is not a comfort measure and is not standard practice for a hospice patient who has stopped breathing.

ARNP Charlotte White, a hospice nurse who examined Doris, also testified.  Nurse White testified that in her February 2018, examination of Doris, Doris was unable to move her arms.  She testified that Doris was very fragile and that Doris's forearms and hands would bruise easily.  However, White also testified that she would not expect bruising to the face of a patient with limbs as contracted as Doris's arms, and that with careful repositioning of a patient, bruising on the face is not normally seen.

Later in the hearing, Suciu admitted that she re-wrote records and shredded other pages from Doris's file.  She testified, "So, I re-described the situation in January of 2019 in more detail with, um – to have a more accurate, um, information of what happened, according to my own recollection, and shredded the other papers."  5 VRP at 15.  She further testified, "I looked over the old file and wrote new pages, rewrote new pages, . . . to accurately describe my recollections, and then didn't save the old pages.  I shredded the old pages.  I didn't realize that I had to keep them, which I'm sorry about."  5 VRP at 16.  Suciu testified that she added notes to some parts of her reports because she had a hard time reading the originals.  She also testified that she "added more information from memory."  5 VRP at 8.

The ALJ entered an initial order affirming the Department's finding of neglect against Suciu.  The ALJ found Suciu's records to be unreliable because of her admitted alteration of

them after the APS investigation began. The ALJ found that Suciu lacked credibility. The ALJ

concluded that Suciu's acts or omissions constituted a pattern of conduct that failed to avoid or

prevent physical harm to Doris, a vulnerable adult, under former RCW 74.34.020(16)(a) (2019).[3]

B.    *Board of Appeals and Final Order*

Suciu petitioned the DSHS Board of Appeals for review of the ALJ's initial order. The

Board entered a final order affirming the ALJ's finding of neglect. AR at 1. The Board entered

numerous findings of fact and conclusions of law. Relevant here, the Board found:

> 7. Ms. Bishop observed bruises to Doris's face, and [Suciu] explained that she had to hold Doris's mouth open to brush her teeth, which caused bruises. Ms. Bishop told [Suciu] that, because Doris was a hospice patient, she should use a sponge to wipe Doris's mouth and teeth instead of a toothbrush, and should not pry Doris's mouth open.
>
> 8. [Suciu] observed Doris having episodes of agitation, when her face would turn red and she would stop breathing. During these episodes, [Suciu] would open Doris's mouth to assist her breathing. This was not medically authorized because Doris was on hospice care and was to receive comfort measures only.
>
>      . . . .
>
> 24. In entering these findings, it was not necessary to decide what actually happened, or to be persuaded beyond a reasonable doubt as to the true state of affairs, nor must the persuasive evidence be clear, cogent, and convincing. As the triers of fact, the ALJ and Review Judge need only determine what most likely happened.
>
> 25. The ALJ found, and the undersigned reviewer concurs, that it was more likely [than] not that Doris did not inflict bruising to herself, and that the bruising occurred because of the acts or omissions of [Suciu]. It is also more likely than not that [Suciu's] records were re-written by [Suciu] for potentially self-serving reasons. Therefore, many of [Suciu's] records, including the medication logs, incident reports, and other documents in those records, may be false, misleading,

---

[3] As explained in detail below, former RCW 74.34.020(16) describes acts that constitute neglect. The ALJ also found that the elements of former RCW 74.34.020(16)(b) were not met because Suciu's acts or omissions did not constitute a "clear and present danger" to Doris. AR at 45.

or otherwise unreliable. It is further found that [Suciu]'s, and her husband's testimony, was not as credible as the testimony of the other witnesses in this matter.

26. These credibility findings are based on the following reasons:

1) [Suciu] and John both testified that Doris could move her left arm, hand, and finger during the time periods at issue in this case.

2) John testified at the hearing that the bruises on the right side of Doris's face were caused by Doris biting down on a sponge about two (2) weeks prior to June 14, 2018. He also testified that Doris would rub her face on her pillow and this could cause the bruising.

3) [Suciu] testified that when she moved Doris using a blue pad, Doris's arm or forehead would sometimes hit the wall, causing a "thump."

4) Charlotte White is an RN and Nurse Practitioner who also provided care for Doris. She testified that Doris was unable to move her finger or hand by at least February 2018, because Doris was so contracted. Ms. White did not observe the bruises to Doris that were present on June 13, 2018. However, she testified that, given Doris's contracted state, she would be shocked to see the bruising in so many different areas on Doris's body and in various stages of healing.

5) Ms. Bishop testified that Doris could not have voluntarily placed her own left hand on the left side of her face. Ms. Stewart testified that she did not observe Doris move her own hands.

6) Ms. Bishop, Ms. White, and Ms. Stewart are all medical professionals, and each testified that Doris could not have caused the bruising to her own face. Ms. White testified that Doris's face could not have been bruised by sleeping with something under her face.

7) The bruises observed by Ms. Bishop on June 13, 2018, were in various stages of healing, which means that they occurred at different times. This means that at least some of Doris's bruises occurred prior to June 13, 2018.

8) Ms. Stewart saw that by June 20, 2018, Doris had no new bruises and her existing bruises were healing. Ms. Quirk also visited Doris on June 20, 2018, and saw that the bruises were healing and fading and that Doris had no new bruises.

9) [Suciu] and John both had a motivation to characterize Doris's bruising as self-inflicted, because it was in [Suciu]'s interest to show that her acts or

omissions did not cause the bruising. Ms. Bishop, Ms. Stewart, and Ms. White are all registered nurses, with specialized training, who have no obvious motivation to provide misinformation or biased opinions. It is therefore found that Doris did not cause the bruising to herself. Although Ms. Bishop testified that Haldol can increase the risk of bruising, and Doris was regularly administered Haldol, every medical professional witness who was asked (besides John and [Suciu]) testified that the bruises could not have occurred as the result of lying on a pillow, sleeping with something under her face, or other similar behaviors.

AR at 3, 5-7.

The Board also entered multiple conclusions of law. Relevant here, the Board concluded:

15. To prove neglect in this case under RCW 74.34.020(12)(a),[4] the Department was required to prove three (3) basic elements by a preponderance of the evidence. These elements were: (1) [Suciu] had a duty of care toward Doris; (2) [Suciu] engaged in a pattern of conduct or inaction; (3) this pattern of conduct or inaction resulted in [Suciu's] failure to provide the goods and services necessary to maintain Doris' physical or mental health, or resulted in Doris experiencing physical or mental harm or pain. Pursuant to the Findings of Fact, as outlined above, the Department has proven each of these elements by a preponderance of the evidence.

16. [Suciu's] negligent actions occurred from December 14, 2017, through June 13, 2018, when she ([Suciu]) caused bruising on Doris's face by incorrectly cleaning Doris's mouth, and by prying Doris's mouth open for procedures that were not medically necessary. Specifically, [Suciu] neglected Doris pursuant to RCW 74.34.020(12)(a), because: (1) She ([Suciu]) had a duty of care toward Doris; (2) [Suciu] repeatedly caused bruising to Doris's face by incorrectly cleaning Doris' mouth and by prying Doris' mouth open for procedures that were not medically necessary, even after being informed by Nurse Bishop, that [Suciu]'s actions were causing the bruising and were unnecessary for a hospice patient; and (3) [Suciu]'s actions resulted in Doris experiencing physical harm or pain as evidenced by Doris's facial bruising that was documented by Nurse Bishop on December 14, 2017, December 26, 2017, April 11, 2018, May 2, 2018, June 6, 2018, and June 13, 2018.

---

[4] Throughout its conclusions of law, the Board cited to RCW 74.34.020(12)(a). This appears to be a scrivener's error. The Board plainly quotes and applies the standard from former RCW 74.34.020(16)(a), neglect of a vulnerable adult.

17. Additionally, the multiple bruises on Doris's right shoulder, right hip, and right tibia, documented on June 13, 2018, also supported a determination that [Suciu] neglected Doris pursuant to RCW 74.34.020(12)(a). Specifically, the hearing's medical testimony established that bruises on legs, hips, or shoulders are not typically seen on a bedbound patient, Doris could not have inflicted these bruises on herself, and these bruises occurred separately, and over a period of time in which Doris could only reposition with [Suciu]'s assistance. Therefore, Doris's inability to move on June 13, 2018, along with the age, nature, and position of her bruises, demonstrated a pattern of conduct by this caregiver Appellant that resulted in Doris being bruised and injured, and substantiated [Suciu]'s neglect of Doris pursuant to RCW 74.34.020(12)(a).

18. The undersigned has considered the Initial Order, the Petition for Review of Initial Decision (Appeal), the Response, and the entire hearing record. The initial Findings of Fact are adopted pursuant to the modifications outlined above. The initial Conclusions of Law cited and applied the governing law correctly and they are adopted and incorporated as conclusions for this decision. Any arguments in the *Petition for Review of Initial Decision (Appeal)* that are not specifically addressed have been duly considered, but are found to have no merit, or to not substantially affect a party's rights. The procedures and time limits for seeking reconsideration or judicial review of this decision are in the attached statement.

AR at 13-15.

C.      *Superior Court*

Suciu petitioned for judicial review of the Board's final order in April, 2020. The superior court held a hearing, heard argument, and affirmed the Board's final order.

Suciu appeals.

ANALYSIS

Suciu assigns error to the Board's findings of fact 7, 8, 24, and 25, arguing that these findings are not supported by substantial evidence. Suciu further argues that the Board erred when it entered conclusions of law 15-18. We disagree.

I.  LEGAL PRINCIPLES

The Administrative Procedure Act (APA), chapter 34.05 RCW, guides our review of the validity of an agency order.  RCW 34.05.570(3); *Raven v. Dep't of Soc. & Health Servs.*, 177 Wn.2d 804, 816, 306 P.3d 920 (2013).  When reviewing an agency action, we sit in the same position as the superior court, and apply the standards of the APA directly to the record before the agency.  *Tapper v. Emp't Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993).

Under RCW 34.05.570(3)(e), we review the Board's factual findings for substantial evidence in light of the whole record.  The appellant has the burden to prove error.  RCW 34.05.570(1)(a).  We review findings of fact for substantial evidence and we will uphold the findings if they are supported by "a sufficient quantity of evidence to persuade a fair-minded person of [their] truth or correctness."  *Raven*, 177 Wn.2d at 817 (quoting *Port of Seattle v. Pollution Control Hr'gs Bd.*, 151 Wn.2d 568, 588, 90 P.3d 659 (2004)) (internal quotation marks omitted).  "We do not reweigh evidence or judge witness credibility, but instead, defer to the agency's broad discretion in weighing the evidence."  *Whidbey Envtl. Action Network v. Growth Mgmt. Hr'gs Bd.*, 14 Wn. App. 2d 514, 526, 471 P.3d 960 (2020).  The Board's unchallenged findings are verities on appeal.  *Karanjah v. Dep't of Soc. & Health Servs.*, 199 Wn. App. 903, 907 n.1, 401 P.3d 381 (2017).

We review de novo an agency's conclusions of law and its application of the law to the facts.  *Raven*, 177 Wn.2d at 817.  We grant substantial weight to the agency's interpretation of the law on subjects within the agency's area of expertise.  *Woldemicael v. Dep't of Soc. & Health Servs.*, 19 Wn. App. 2d 178, 181-82, 494 P.3d 1100 (2021) (published in part).

Former RCW 74.34.020(16) (2019)[5] provides:

> "Neglect" means (a) a pattern of conduct or inaction by a person or entity with [1] a duty of care that [2] fails to provide the goods and services that maintain physical or mental health of a vulnerable adult, or that [3] fails to avoid or prevent physical or mental harm or pain to a vulnerable adult; or (b) an act or omission by a person or entity with a duty of care that demonstrates a serious disregard of consequences of such a magnitude as to constitute a clear and present danger to the vulnerable adult's health, welfare, or safety, including but not limited to conduct prohibited under RCW 9A.42.100.[6]

WAC 388-76-10400(3) provides:

> The adult family home must ensure each resident receives:
> . . . .
> (3) The care and services in a manner and in an environment that:
> (a) Actively supports, maintains or improves each resident's quality of life;
> (b) Actively supports the safety of each resident; and
> (c) Reasonably accommodates each resident's individual needs and preferences except when the accommodation endangers the health or safety of the individual or another resident.

The standard of proof before the Board is a preponderance of the evidence. WAC 388-02-485. "This standard means that it is more likely than not that something happened or exists."

WAC 388-02-485.

---

[5] RCW 74.34.020(16) has since been recodified in the same section with identical text.

[6] The consequences of a neglect finding are severe because under RCW 74.39A.056(2)-(3), a person found to have neglected a vulnerable adult under chapter 74.34 RCW will be placed on a permanent registry and will not be permitted unsupervised access to vulnerable adults or children in any Department-administered programs and will not be granted a new adult family home license. *See also* WAC 388-76-10120(3)(d)(iii) *and* DSHS Secretary's List of Crimes and Negative Actions for Use by All Programs Administered by DSHS (May 2022), https://www.dshs.wa.gov/sites/default/files/bccu/documents/Secretary%E2%80%99sCrimesListf orALLPrograms.pdf.

II.  FINDINGS OF FACT

Suciu argues that substantial evidence does not support the Board's findings that Suciu exhibited a pattern of conduct or inaction that failed to maintain Doris's physical or mental health, or that Suciu failed to avoid or prevent physical or mental harm or pain to Doris.  Suciu specifically assigns error to the Board's findings of fact 7, 8, 24, and 25.  The Department argues that substantial evidence supports each of these findings.  We agree with the Department.

A.     *Finding of Fact 7: Nurse Bishop's Instructions to Suciu on Brushing Teeth*

Suciu argues that substantial evidence does not support the Board's finding of fact 7 from its final order.  Specifically, she argues that there was no evidence that she "pried" open Doris's mouth.  We hold that substantial evidence supports finding of fact 7.  The Board found:

> 7. Ms. Bishop observed bruises to Doris's face, and [Suciu] explained that she had to hold Doris's mouth open to brush her teeth, which caused bruises.  Ms. Bishop told [Suciu] that, because Doris was a hospice patient, she should use a sponge to wipe Doris's mouth and teeth instead of a toothbrush, and should not pry Doris's mouth open.

AR at 3.

In a June 26 declaration to APS, Nurse Bishop stated that on May 2, she had noted bruising to Doris's chin, forearms, and upper lip.  According to Bishop, when Bishop asked Suciu how it had happened, Suciu told Bishop it happened because she had to pry Doris's mouth open to brush Doris's teeth.  Bishop stated that she instructed Suciu to cease brushing Doris's teeth and not forcing care.  Bishop then stated she subsequently saw significant bruising on Doris on June 6 and 13 "consistent with . . . forced oral care."  AR at 191.  APS investigator Quirk testified that Suciu told the APS reporter that Doris's bruises were caused by Suciu prying Doris's mouth open after she clenched down on a toothbrush.

Nurse Bishop then testified that when she asked Suciu about the bruising, Suciu stated it was caused by holding Doris's mouth open while Suciu brushed her teeth. "[Suciu] stated that it was because they have to hold her chin and upper lip to pry her mouth open to brush her teeth." 1 VRP at 69. Bishop testified that she tried to educate Suciu on not forcing Doris's mouth open, to forgo using a toothbrush, and that using a sponge to gently wipe a patient's teeth was more appropriate.

Nurse Bishop testified, however, that the word "pry" was "probably" Bishop's word, not Suciu's because Bishop did not note it as a quote in her notes. 1 VRP at 106. Suciu also testified that on June 2, 2018, Doris had clenched down on a sponge when Suciu was trying to brush her teeth and that Suciu had waited for Doris to release the sponge.

Here, Nurse Bishop's declaration to APS, her testimony consistent with that declaration, and Quirk's testimony all stated that Suciu told Bishop that she had forcibly opened Doris's mouth when trying to remove a toothbrush. Conversely, Suciu testified that Doris clenched down on a sponge and that she let Doris release it in her own time. Taking these facts in light of the whole record, including the negative credibility findings entered against Suciu, Suciu's inconsistent statements concerning Doris's oral care, the consistent report and testimony of Nurse Bishop, and the Board's findings that Suciu was less credible than the other witnesses, there is substantial evidence to support finding of fact 7 by a preponderance of the evidence.

B.    *Finding of Fact 8: Suciu Opened Doris's Mouth to Assist Her Breathing*

Suciu argues that substantial evidence does not support the Board's finding of fact 8 from its final order because she was allowed "manual treatment of airway obstruction as needed for comfort" under the POLST. Br. of Appellant at 32. She also argues that she was actually giving

Doris medication. We hold that substantial evidence supports finding of fact 8. The Board found:

> 8. [Suciu] observed Doris having episodes of agitation, when her face would turn red and she would stop breathing. During these episodes, [Suciu] would open Doris's mouth to assist her breathing. This was not medically authorized because Doris was on hospice care and was to receive comfort measures only.

AR at 3.

The record is replete with instances where Suciu stated Doris would become agitated. In her reports, Suciu stated Doris needed help and that she opened the side of Doris's mouth for Doris to breathe through, after which Suciu gave Doris an extra dose of Haldol to calm her. Then Suciu later testified that she did not pry open Doris's mouth to help her breathe, but that she administered medication.

Quirk testified that Suciu told Quirk that when Doris had a hard time breathing Suciu would shake Doris and pry her mouth open, and then Doris would gasp for air. Quirk testified that when she asked Suciu if she was trained to pry open Doris's mouth, Suciu responded, "no," but then asked what she was supposed to do. 3 VRP at 70. Quirk testified that Suciu stated she knew about the DNR but stated, "Did you want me to let her die? I was providing hospice." 3 VRP at 70. Quirk testified that she asked if Suciu had been delegated authority to open Doris's mouth in such circumstances, and Suciu said no.

Doris's POLST stated that in the event Doris stopped breathing she was to receive "comfort measures only." AR at 282. Nurse Bishop was asked about whether, in the context of Doris's POLST, what would constitute "comfort measures," or "manual treatment of airway obstruction as needed for comfort." 1 VRP at 83. Bishop testified that "manual treatment would be if someone was choking on food, is how I would interpret that. And you could do a . . . finger

sweep to remove, um, food." 1 VRP at 84. Likewise, she testified that people on hospice are "expected to die a natural death. And if they are not breathing, there is no reason why you would open their mouth." 1 VRP at 85. Hospice Nurse Stewart testified that forcing a mouth open is not a comfort measure and is not standard practice for a hospice patient who has stopped breathing.

Here, Suciu's testimony conflicted with the medical records she recorded and the statements she made to Quirk. The Board also found Suciu lacked credibility. In light of the full record, Doris's POLST, Suciu's records, and Quirk and Bishop's testimony, substantial evidence supports the Board's finding of fact 8.

C.      *Finding of Fact 24: Preponderance Standard Explained*

Suciu next argues that substantial evidence does not support the Board's finding of fact 24. We disagree. The Board found:

> 24. In entering these findings, it was not necessary to decide what actually happened, or to be persuaded beyond a reasonable doubt as to the true state of affairs, nor must the persuasive evidence be clear, cogent, and convincing. As the triers of fact, the ALJ and Review Judge need only determine what most likely happened.

AR at 5.

Suciu does not dispute that the Board properly applied the appropriate preponderance of evidence standard. Instead, Suciu argues that the Board was not "entitled to pick and choose between various hypotheticals as to which was most likely to have happened." Br. of Appellant at 33. Although the Board clumsily stated the preponderance standard as "what most likely happened," (instead of whether it is "more likely than not that something happened," WAC 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) it is clear from viewing the whole record that the Board did not entertain supposition or

hypothetical, but instead relied on five days of testimony and months of medical records, and made factual determinations. Suciu's argument fails.

D.    *Finding of Fact 25: Doris Did Not Inflict Bruising to Herself*

Suciu then argues that substantial evidence does not support finding of fact 25. We disagree. The Board found:

> 25. The ALJ found, and the undersigned reviewer concurs, that it was more likely [than] not that Doris did not inflict bruising to herself, and that the bruising occurred because of the acts or omissions of [Suciu]. It is also more likely than not that [Suciu's] records were re-written by [Suciu] for potentially self-serving reasons. Therefore, many of [Suciu's] records, including the medication logs, incident reports, and other documents in those records, may be false, misleading, or otherwise unreliable. It is further found that [Suciu]'s, and her husband's testimony, was not as credible as the testimony of the other witnesses in this matter.

AR at 5-6.

ARNP White, Nurse Bishop, and Nurse Angela Stewart each testified Doris lacked the ability to self-inflict the bruising to her face, and none of them observed that Doris was able to move her left hand or arm after November 2017. Doris was severely constricted in her arm and leg movement.

Suciu admitted that she re-wrote records and shredded other papers. 5 VRP at 15. She testified, "So, I re-described the situation in January of 2019 in more detail with, um – to have a more accurate, um, information of what happened, according to my own recollection, and shredded the other papers." 5 VRP at 15. She further testified, "I looked over the old file and wrote new pages, rewrote new pages, . . . to accurately describe my recollections, and then didn't save the old pages. I shredded the old pages. I didn't realize that I had to keep them, which I'm sorry about." 5 VRP at 16. Suciu testified that she added notes to some parts of her reports

because she had a hard time reading the originals. She also testified that she "added more information from memory." 5 VRP at 8.

We do not review credibility determinations. *Whidbey Envtl. Action Network*, 14 Wn. App. 2d at 526. Based on the nurses' testimony, and taken in light of Suciu's non-credible records and testimony, substantial evidence supports the Board's findings that Doris more likely than not did not inflict bruising on herself.

Accordingly, we hold that substantial evidence supports all the Board's contested findings of fact. Suciu does not challenge the remainder of the Board's findings and they are verities on appeal. *Karanjah*, 199 Wn. App. at 907 n.1.

### III. CONCLUSIONS OF LAW

Next, Suciu assigns error to conclusions of law 15, 16, 17, and 18. The Department argues that the Board's conclusions were supported by the findings of fact and not in error. We agree with the Department.

We review de novo an agency's conclusions of law and its application of the law to the facts. *Raven*, 177 Wn.2d at 817.

A.      *Conclusions of Law 15 and 18*

As an initial matter, Suciu assigns error to the Board's conclusions of law 15 and 18. However, Suciu does not argue these issue in her brief. Accordingly, we need not address them. *See Long v. Snoqualmie Gaming Comm'n*, 7 Wn. App. 2d 672, 690, 435 P.3d 339 (2019) ("We need not address an issue that a party does not argue in its brief.").

B.      *Conclusions of Law*

Suciu assigns error to conclusions of law 16, and 17. The Board concluded:

23

16. [Suciu's] negligent actions occurred from December 14, 2017, through June 13, 2018, when she ([Suciu]) caused bruising on Doris's face by incorrectly cleaning Doris's mouth, and by prying Doris's mouth open for procedures that were not medically necessary. Specifically, [Suciu] neglected Doris pursuant to RCW 74.34.020(12)(a), because: (1) She ([Suciu]) had a duty of care toward Doris; (2) [Suciu] repeatedly caused bruising to Doris's face by incorrectly cleaning Doris' mouth and by prying Doris' mouth open for procedures that were not medically necessary, even after being informed by Nurse Bishop, that [Suciu]'s actions were causing the bruising and were unnecessary for a hospice patient; and (3) [Suciu]'s actions resulted in Doris experiencing physical harm or pain as evidenced by Doris's facial bruising that was documented by Nurse Bishop on December 14, 2017, December 26, 2017, April 11, 2018, May 2, 2018, June 6, 2018, and June 13, 2018.

17. Additionally, the multiple bruises on Doris's right shoulder, right hip, and right tibia, documented on June 13, 2018, also supported a determination that [Suciu] neglected Doris pursuant to RCW 74.34.020(12)(a). Specifically, the hearing's medical testimony established that bruises on legs, hips, or shoulders are not typically seen on a bedbound patient, Doris could not have inflicted these bruises on herself, and these bruises occurred separately, and over a period of time in which Doris could only reposition with [Suciu]'s assistance. Therefore, Doris's inability to move on June 13, 2018, along with the age, nature, and position of her bruises, demonstrated a pattern of conduct by this caregiver Appellant that resulted in Doris being bruised and injured, and substantiated [Suciu]'s neglect of Doris pursuant to RCW 74.34.020(12)(a).

AR at 14.

As noted above, the Board's citations to RCW 74.34.020(12)(a) are a scrivener's error. The Board plainly quotes and applies the standard from former RCW 74.34.020(16)(a), neglect of a vulnerable adult. Although Suciu assigns error to these conclusions, she does not argue that the Board cited to the wrong legal standard, but instead assigns error to the conclusions the Board drew after applying the law as it was under RCW 74.34.020(16)(a). Reviewing these conclusions de novo, we apply former RCW 74.34.020(16), which provides:

"Neglect" means (a) a pattern of conduct or inaction by a person or entity with [1] a duty of care that [2] fails to provide the goods and services that maintain physical or mental health of a vulnerable adult, or that [3] fails to avoid or prevent physical or mental harm or pain to a vulnerable adult; or (b) an act or omission by

24

a person or entity with a duty of care that demonstrates a serious disregard of consequences of such a magnitude as to constitute a clear and present danger to the vulnerable adult's health, welfare, or safety, including but not limited to conduct prohibited under RCW 9A.42.100.

1. *Nexus*

First, Suciu argues that there is no nexus here between Doris's bruising and her stay at Suciu's home. We disagree.

Although the Department is not required to prove causation, our Supreme Court has held that RCW 74.34.020(12) requires a nexus between the injury and the conduct of the alleged perpetrator. *Raven*, 177 Wn.2d at 831.

> To be clear, the plain language of RCW 74.34.020(12) does not require that the alleged perpetrator of neglect be the only actor with problematic conduct. But the statute does require that the alleged perpetrator's actions or conduct fail to provide goods or services, or avoid harm to the ward. This is not a tort causation standard, but it plainly requires a nexus.

*Raven*, 177 Wn.2d at 831.

The findings of fact clearly support that Doris's bruising happened while in Suciu's care. ARNP White, Nurse Bishop, and Nurse Angela Stewart each testified Doris was severely constricted in her arm movement, lacked the ability to self-inflict the bruising to her face, and none of them observed that Doris was able to move her left hand or arm after November 2017.

25

Doris's bruising had started to fade and heal when she was removed from Suciu's home, and Doris displayed no new bruising.[7]

Moreover, when Doris had a hard time breathing, Suciu would pry Doris's mouth open, which was not medically authorized. Suciu also told Nurse Bishop that she held Doris's mouth open to brush her teeth, which caused the bruising. But Suciu later gave a conflicting statement to Quirk that the bruises were the result of Doris sleeping with a finger in her mouth. These findings of fact all support the conclusion that a nexus exists between Doris's injuries and her stay and Suciu's home.

2. *Pattern of Conduct or Inaction That Fails to Provide for or Prevent Physical or Mental Harm to the Vulnerable Adult*

Suciu argues that there were only two incidents where Doris's bruising may have been caused by Suciu's repositioning Doris, and that otherwise the June 2, 2018, tooth brushing incident was the only other event that caused Doris's bruising. Suciu argues that two or three isolated incidents do not constitute a pattern under former RCW 74.34.020(16)(a), and that Doris's bruising was attributable to Doris's frailty and isolated injury incidents during Suciu's repositioning Doris. We disagree for two reasons. First, the record shows that Doris had a longer history of bruises than those in Suciu's incident reports, which could not be attributed to Haldol alone because of Doris's inability to move. Second, those incident reports that Suciu

---

[7] Doris's apparent healing when she was removed from Suciu's home is not, by itself, dispositive of a nexus. *See Raven*, 177 Wn.2d at 830-31 (describing that where a patient removed from a care home was apparently recovering in a rehabilitation facility, her death at the facility prevented the court from concluding what would have happened had the victim returned to the home; "The record gives no reason to conclude that pattern would not have continued even after [the patient] had returned from a temporary placement outside the home.").

submitted, as well as her other records, are of questionable credibility because of her manipulation of the records.

a.  *Pattern of Conduct or Inaction*

Suciu argues that two or three isolated incidents do not a pattern make.  We need not determine how many incidents are required to create a "pattern" under former RCW 74.34.020(16)(a) because the record shows more than the two or three isolated incidents Suciu argues caused Doris's bruising.

To the extent we can rely on them, Suciu filed multiple incident reports describing bruising to Doris in 2017: July 5, July 17-25, September 1, October 28, and December 20.  Nurse Bishop noted bruising to Doris's head on December 14 and 26, 2017, and April 11, May 2, and June 6 and 13, 2018.  On June 13, Doris also had bruises to her shoulder, hip and tibia.

Moreover, Nurse Bishop saw the bruising after the tooth brushing incident and told Suciu to modify her method of care, and then observed more bruising at a later checkup.  ARNP White, Nurse Bishop, and Nurse Stewart also testified that Doris's bruises were in various stages of healing, which suggested they had been caused over a period of time.  AR at 3, 6, 41.  From this, we can conclude that a pattern of conduct or inaction existed on Suciu's part that had a nexus to Doris's bruising under former RCW 76.34.020(16)(a).

b.  *Failure to Provide Goods and Services That Maintain Physical or Mental Health of a Vulnerable Adult or Fails to Avoid or Prevent Physical or Mental Harm or Pain to a Vulnerable Adult*

Suciu next appears to argue that Doris's bruises were caused by different events that either do not amount to a pattern or are not attributable to Suciu's conduct.  Suciu argues that her repositioning of Doris may have caused bruises on two occasions, and that Suciu's manipulation

of Doris's mouth when Doris struggled to breathe was a different event that caused bruising. Suciu further argues the bruising could be attributed to Doris's Haldol prescription.

But when taken together, in light of the record as a whole, these events show a pattern of treatment by Suciu—whether from repositioning or other actions—that resulted in Doris's consistent bruising that went beyond what would have been expected from Haldol alone. As the Board's uncontested finding of fact explains, "[E]very medical professional witness who was asked (besides John and [Suciu]) testified that the bruises could not have occurred as the result of lying on a pillow, sleeping with something under her face, or other similar behaviors." AR at 7.

Although Doris bruised easily because of her age and the administration of Haldol, the pattern and location of the bruises, Suciu's description to APS investigator Jones of opening Doris's mouth to open her airway, and Suciu's inconsistent explanations for the bruising to Doris's face, all support the Board's finding that Suciu's "unnecessary" actions caused Doris's bruising. Accordingly, we conclude that under former RCW 74.34.020(16)(a), either Suciu failed to provide goods and services to maintain Doris's physical health, or Suciu failed to prevent physical harm to Doris, which resulted in significant bruising to Doris. Thus, we conclude that the Board's conclusions of law 16 and 17 were not error.

4. *Act or Omission That Demonstrates a Serious Disregard of Consequences of Such a Magnitude as To Constitute a Clear and Present Danger To the Vulnerable Adult's Health*

Next, Suciu argues that she did not commit an act or omission that demonstrated a serious disregard of consequences in violation of former RCW 74.34.020(16)(b). We agree.

The Board made no finding that Suciu violated RCW 74.34.020(16)(b). Indeed, in conclusion of law 17, the Board ruled that Suciu "demonstrated a pattern of conduct"—wording taken directly from former RCW 74.34.020(16)(a), not (b). AR at 14. The Board also adopted

28

and incorporated the ALJ's findings and conclusions from the initial order. AR at 14-15. And the ALJ found no basis to conclude Suciu's acts or omissions constituted a "clear and present danger" to Doris under RCW 74.34.020(16)(b). AR at 45. Accordingly, we hold that although Suciu neglected Doris under former RCW 74.34.020(16)(a), there was no finding of neglect under (16)(b).

## CONCLUSION

We hold that the Board's findings of fact are supported by substantial evidence. We further hold that the Board did not err in its conclusions of law and properly applied law to facts. Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Worswick, J.

We concur:

Maxa, J.

Cruser, A.C.J.